## BLAKE *v.* UNITED STATES.

1. The President has the power to supersede or remove an officer of the army or the navy by the appointment, by and with the advice and consent of the Senate, of his successor.
2. It was not the purpose of the fifth section of the act of July 13, 1866, c. 176 (12 Stat. 92), to withdraw that power.

APPEAL from the Court of Claims.

This suit was instituted in the Court of Claims, by Blake, to recover the amount claimed to be due him, by way of salary as a post-chaplain in the army, from April 28, 1869, to May 14, 1878.

The court below found that, under date of Dec. 24, 1868, Blake, a post-chaplain in the army, stationed at Camp McDowell, Arizona, addressed to the Secretary of War a communication, in which he complained of unjust treatment to which, during several years, he had been subjected by various officers. He asked for the fullest and most thorough investigation of the facts, and concluded: "But if this cannot be done, then I wish to tender to the Honorable the Secretary of War my resignation as a chaplain of the army, and to lay the facts, which I have for years been accumulating with the greatest care, before the church and the country at large." After this letter came to the hands of the post commandant, his attention was called to the mental condition of Blake, and it was suggested that the latter was not responsible for his act in writing the letter. It was, therefore, retained until Dec. 31, 1868, when it was forwarded by the commandant with an indorsement recommending the acceptance of the resignation, and saying, among other things, that "the tenor of this and other communications forwarded will, no doubt, convince the department commander of his utter uselessness in the position he holds."

The letter of Dec. 24, 1868, was forwarded through the district and department headquarters, and, finally, through the headquarters of the military division of the Pacific, to the Secretary of War, by whom it was transmitted to the President, who accepted the resignation, to take effect March 17, 1869. Each of the commanding officers through whose office

the letter passed recommended the acceptance of the resignation.

On March 28, 1869, Blake telegraphed to the delegate in Congress from Arizona, stating that he did not intend to resign, and that if his letter was construed as a resignation, to withdraw it immediately. When the Secretary of War was informed of the telegram, he stated that the resignation had been accepted and was beyond recall.

Blake, having received official notice of such acceptance, addressed the following letter to the Secretary of War: —

"NAPA CITY, CAL., April 27, 1869.

"Hon. JOHN A. RAWLINS,

"*Secretary of War, Washington, D.C.:*

"DEAR SIR, — To my great surprise I was yesterday informed, thro' H'd Q'rs Dep't of California, that my 'resignation' as post-chaplain, U. S. Army, 'had been accepted by the President,' 'to take effect March 17, 1869.'

"As I am not aware of having at any time resigned my commission, and as I am now in a state of feeble health, caused by efficient services in the line of duty in 1863, 1864, and since, I beg that the favorable reconsideration of the President may be given to my case, and that I may be ordered before a retiring board for examination, and to duty if fit for it.

"Justice to the service, no less than to myself and family, after eight years of devoted labors, will not permit me to be silent in view of the wrongs done me at Camp McDowell, A. T., and I am confident that you will not allow me to suffer wrongfully.

"I have the honor to remain, with great respect, your ob'd't servant,

(Signed)     "CHARLES M. BLAKE,
"(*Late*) *Post Chaplain, U. S. A.*"

This letter was referred to the adjutant-general, who returned it with this indorsement: —

"Respectfully returned to the Secretary of War, with the paper on which the resignation of Chaplain Blake was accepted. Chaplain Blake appears not to be of sane mind.

"E. D. TOWNSEND, *Adjt.-Genl.*"

On July 7, 1870, the President nominated to the Senate six persons to be post-chaplains in the army, to rank from July 2,

1870; among them was that of "Alexander Gilmore, of New Jersey, *vice* Blake, resigned." Gilmore's nomination was confirmed July 12, 1870, and on the 14th of that month he was commissioned as post-chaplain, to rank as such from July 2, 1870. He has since regularly received his salary and performed his duties as such post-chaplain.

The court further found, that for some time prior to, and on, Dec. 24, 1868, Blake had been suffering from physical disease and mental prostration; that in the light of subsequent events "there can be no doubt he was then insane;" that he was, at times, irritable and incoherent, manifesting egotism and suspicion of his superiors; that not until after the above date were these symptoms developed to such an extent as necessarily to induce persons who came in contact with him to believe he was mentally incapable of acting with sound reasoning purpose; also that, at the date of the telegram to the delegate from Arizona, he was "totally unqualified for business," and at the date of the letter of April 27, 1869, "he was not of sound mind."

It also found that the insanity of Blake continued until about the year 1874.

On Sept. 28, 1878, the President made the following order:

"EXECUTIVE MANSION, Sept. 28, 1878.

"It appearing from the evidence, and from the reports of the surgeon-general of the army and the superintendent of the government hospital for the insane, that Chaplain Blake was insane at the time he tendered his resignation, it is held that said resignation was and is void, and the acceptance thereof is set aside. Chaplain Blake will be ordered to duty, and paid from the date of the resignation of post-chaplain Preston Nash, to wit, May 14, 1878, by which resignation a vacancy was created, which has not been filled. The claim of Chaplain Blake for pay from the date of his resignation to May 14, 1878, during which his successor held the office, discharged its duties, and received pay, is not decided, but is left for the decision of the court, where it is understood to be now pending.

"R. B. HAYES."

Oct. 2, 1878, the following order was issued by direction of the general of the army : —

"HEADQUARTERS OF THE ARMY,
"ADJUTANT-GENERAL'S OFFICE,
"WASHINGTON, Oct. 2, 1878.

"1. It appearing from the evidence presented, and from the reports of the surgeon-general of the army, and the superintendent of the government hospital for the insane, that Post-Chaplain Charles M. Blake, U. S. Army, was insane at the time he tendered his resignation, December 24, 1868, said resignation is, by direction of the President, declared void, and the acceptance of the same in letter from this office, dated March 17, 1869, as announced in Special Orders No. 62, March 17, 1869, from this office, is set aside.

"Chaplain Blake is restored to the list of post-chaplains of the army with his original date of rank, and with pay from May 14, 1878, since which date a vacancy in that grade has existed. He will report in person to the commanding officer, department of Arizona, for assignment to duty.

.    .    .    .    .    .    .    .    .    .    .    .    .

"By command of General Sherman.
(Signed)        "E. D. TOWNSEND, *Adjutant-General.*"

The court below dismissed the petition, whereupon Blake appealed to this court.

*Mr. George H. Williams* and *Mr. Ralph P. Lowe*, for the appellant.

*Mr. Attorney-General Devens*, contra.

MR. JUSTICE HARLAN delivered the opinion of the court.

The claim of Blake is placed upon the ground that before, at the date of, and after the letter addressed to the Secretary of War, which was treated as his resignation, he was insane in a sense that rendered him irresponsible for his acts, and consequently that his supposed resignation was inoperative and did not have the effect to vacate his office. Did the appointment of Gilmore, by and with the advice and consent of the Senate, to the post-chaplaincy held by Blake, operate, *proprio vigore*, to discharge the latter from the service, and invest the former with the rights and privileges belonging to that office? If this question be answered in the affirmative, it will not be necessary to inquire whether Blake was, at the date of the letter of Dec. 24, 1868, in such condition of mind as to enable him to per-

form, in a legal sense, the act of resigning his office; or, whether the acceptance of his resignation, followed by the appointment of his successor, by the President, by and with the advice and consent of the Senate, is not, in view of the relations of the several departments of the government to each other, conclusive, in this collateral proceeding, as to the fact of a valid effectual resignation.

From the organization of the government, under the present Constitution, to the commencement of the recent war for the suppression of the rebellion, the power of the President, in the absence of statutory regulations, to dismiss from the service an officer of the army or navy, was not questioned in any adjudged case, or by any department of the government.

Upon the general question of the right to remove from office, as incident to the power to appoint, *Ex parte Hennan* (13 Pet. 259) is instructive. That case involved the authority of a district judge of the United States to remove a clerk and appoint some one in his place.

The court, among other things, said: " All offices, the tenure of which is not fixed by the Constitution or limited by law, must be held either during good behavior, or (which is the same thing in contemplation of law) during the life of the incumbent, or must be held at the will and discretion of some department of the government, and subject to removal at pleasure.

" It cannot for a moment be admitted that it was the intention of the Constitution that those offices which are denominated inferior offices should be held during life. And if removable at pleasure, by whom is such removal to be made? In the absence of all constitutional provision or statutory regulation, it would seem to be a sound and necessary rule to consider the power of removal as incident to the power of appointment. This power of removal from office was a subject much disputed, and upon which a great diversity of opinion was entertained in the early history of this government. This related, however, to the power of the President to remove officers appointed with the concurrence of the Senate; and the great question was whether the removal was to be by the President alone, or with the concurrence of the Senate, both consti-

tuting the appointing power. No one denied the power of the President and Senate jointly to remove, where the tenure of the office was not fixed by the Constitution; which was a full recognition of the principle that the power of removal was incident to the power of appointment. But it was very early adopted, as the practical construction of the Constitution, that this power was vested in the President alone. And such would appear to have been the legislative construction of the Constitution." 1 Kent, Com. 309; 2 Story, Const. (4th ed.), sects. 1537–1540, and notes; 2 Marshall, Life of Washington, 162; Sergeant, Const. Law, 372; Rawle, Const., c. 14.

During the administration of President Tyler, the question was propounded by the Secretary of the Navy to Attorney-General Legare, whether the President could strike an officer from the rolls, without a trial by a court-martial, after a decision in that officer's favor by a court of inquiry ordered for the investigation of his conduct. His response was: " Whatever I might have thought of the power of removal from office, if the subject were *res integra*, it is now too late to dispute the settled construction of 1789. It is according to that construction, from the very nature of executive power, absolute in the President, subject only to his responsibility to the country (his constituents) for a breach of such a vast and solemn trust. 3 Story, Com. Const. 397, sect. 1538. It is obvious that if necessity is a sufficient ground for such a concession in regard to officers in the civil service, the argument applies *a multo fortiori* to the military and naval departments. . . . I have no doubt, therefore, that the President had the constitutional power to do what he did, and that the officer in question is not in the service of the United States." The same views were expressed by subsequent attorneys-general. 4 Opin. 1; 6 id. 4; 8 id. 233; 12 id. 424; 15 id. 421.

In *Du Barry's Case* (4 id. 612) Attorney-General Clifford said that the attempt to limit the exercise of the power of removal to the executive officers in the civil service found no support in the language of the Constitution nor in any judicial decision; and that there was no foundation in the Constitution for any distinction in this regard between civil and military officers.

In *Lansing's Case* (6 id. 4) the question arose as to the power of the President, in his discretion, to remove a military storekeeper.    Attorney-General Cushing said : " Conceding, however, that military storekeepers are officers, or, at least, quasi officers, of the army, it does not follow that they are not subject to be deprived of their commission at the will of the President.

" I am not aware of any ground of distinction in this respect, so far as regards the strict question of law, between officers of the army and any other officers of the government. As a general rule, with the exception of judicial officers only, they all hold their commissions by the same tenure in this respect.    Reasons of a special nature may be deemed to exist why the rule should not be applied to military in the same way as it is to civil officers, but the legal applicability to both classes of officers is, it is conceived, the settled construction of the Constitution.    It is no answer to this doctrine to say that officers of the army are subject to be deprived of their commissions by the decision of a court-martial.    So are civil officers by impeachment.    The difference between the two cases is in the form and mode of trial, not in the principle, which leaves unimpaired in both cases alike the whole constitutional power of the President.

" It seems unnecessary in this case to recapitulate in detail the elements of constitutional construction and historical induction by which this doctrine has been established as the public law of the United States.    I observe only that, so far as regards the question of abstract power, I know of nothing essential in the grounds of legal conclusion, which have been so thoroughly explored at different times in respect of civil officers, which does not apply to officers of the army."

The same officer, subsequently, when required to consider this question, said that " the power has been exercised in many cases with approbation, express or implied, of the Senate, and without challenge by any legislative act of Congress.    And it is expressly reserved in every commission of the officers, both of the navy and army."    8 Opin. 231.

Such was the established practice in the Executive Department, and such the recognized power of the President up to the

passage of the act of July 17, 1862, c. 200 (12 Stat. 596), entitled " An Act to define the pay and emoluments of certain officers of the army, and for other purposes," the seventeenth section of which provides that " the President of the United States be, and hereby is, authorized and requested to dismiss and discharge from the military service, either in the army, navy, marine corps, or volunteer force, any officer for any cause which, in his judgment, either renders such officer unsuitable for, or whose dismission would promote, the public service."

In reference to that act Attorney-General Devens (15 Opin. 421) said, with much reason, that so far as it " gives authority to the President, it is simply declaratory of the long-established law. It is probable that the force of the act is to be found in the word ' requested,' by which it was intended to re-enforce strongly this power in the hands of the President at a great crisis of the State."

The act of March 3, 1865, c. 79 (13 Stat. 489), provides that, in case any officer of the military or naval service, thereafter dismissed by the authority of the President, shall make application in writing for a trial, setting forth, under oath, that he has been wrongfully and unjustly dismissed, " the President shall, as soon as the necessities of the service may permit, convene a court-martial to try such officer on the charges on which he was dismissed. And if such court-martial shall not award dismissal or death as the punishment of such officer, the order of dismissal shall be void. And if the court-martial aforesaid shall not be convened for the trial of such officer within six months from the presentation of his application for trial, the sentence of dismissal shall be void."

Thus, so far as legislative enactments are concerned, stood the law in reference to dismissals, of army or naval officers, by the President, until the passage of the army appropriation act of July 17, 1866, c. 176 (14 Stat. 92), the fifth section of which is as follows : —

" That section seventeen of an act, entitled ' An Act to define the pay and emoluments of certain officers of the army,' approved July seventeenth, eighteen hundred and sixty-two, and a resolution, entitled ' A Resolution to authorize the President to assign the command of troops in the same field, or department, to officers of the

same grade, without regard to seniority,' approved April fourth, eighteen hundred and sixty-two, be, and the same are, hereby repealed. And no officer in the military or naval service shall, in time of peace, be dismissed from the service, except upon and in pursuance of the sentence of a court-martial to that effect, or in commutation thereof."

Two constructions may be placed upon the last clause of that section without doing violence to the words used. Giving them a literal interpretation, it may be construed to mean, that although the tenure of army and naval officers is not fixed by the Constitution, they shall not, in time of peace, be dismissed from the service, under any circumstances, or for any cause, or by any authority whatever, except in pursuance of the sentence of a court-martial to that effect, or in commutation thereof. Or, in view of the connection in which the clause appears, — following, as it does, one in the same section repealing provisions touching the dismissal of officers by the President, alone, and to assignments, by him, of the command of troops, without regard to seniority of officers, — it may be held to mean, that, whereas, under the act of July 17, 1862, as well as before its passage, the President, alone, was authorized to dismiss an army or naval officer from the service for any cause which, in his judgment, either rendered such officer unsuitable for, or whose dismissal would promote, the public service, he alone shall not, thereafter, in time of peace, exercise such power of dismissal, except in pursuance of a court-martial sentence to that effect, or in commutation thereof. Although this question is not free from difficulty, we are of opinion that the latter is the true construction of the act. That section originated in the Senate as an amendment of the army appropriation bill which had previously passed the House of Representatives. Cong. Globe, 39th Congress, pp. 3254, 3405, 3575, and 3589. It is supposed to have been suggested by the serious differences existing, or which were apprehended, between the legislative and executive branches of the government in reference to the enforcement, in the States lately in rebellion, of the reconstruction acts of Congress. Most, if not all, of the senior officers of the army enjoyed, as we may know from the public history of that period, the confidence of the political organization then controlling the

legislative branch of the government. It was believed that, within the limits of the authority conferred by statute, they would carry out the policy of Congress, as indicated in the re-construction acts, and suppress all attempts to treat them as unconstitutional and void, or to overthrow them by force. Hence, by way of preparation for the conflict then apprehended between the executive and legislative departments as to the enforcement of those acts, Congress, by the fifth section of the act of July 13, 1866, repealed not only the seventeenth section of the act of July 17, 1862, but also the resolution of April 4, 1862, which authorized the President, whenever military operations required the presence of two or more officers of the same grade, in the same field or department, to assign the command without regard to seniority of rank. In furtherance, as we suppose, of the objects of that legislation, was the second section of the army appropriation act of March 2, 1867, c. 170 (14 Stat. 486), establishing the headquarters of the general of the army at Washington, requiring all orders and instructions relating to military operations issued by the President or Secretary of War to be issued through that officer, and, in case of his inability, through the next in rank, and declaring that the general of the army "shall not be removed, suspended, or relieved from command, or assigned to duty elsewhere than at said head-quarters, except at his own request, without the previous approval of the Senate, and any orders or instructions relating to military operations issued contrary to the requirements of this section shall be null and void; and any officer who shall issue orders or instructions contrary to the provisions of this section shall be deemed guilty of a misdemeanor in office," &c.

Our conclusion is that there was no purpose, by the fifth section of the act of July 13, 1866, to withdraw from the President the power, with the advice and consent of the Senate, to supersede an officer in the military or naval service by the appointment of some one in his place. If the power of the President and Senate, in this regard, could be constitutionally subjected to restrictions by statute (as to which we express no opinion), it is sufficient for the present case to say that Congress did not intend by that section to impose them. It is, in substance and effect, nothing more than a declaration, that the

power theretofore exercised by the President, without the concurrence of the Senate, of summarily dismissing or discharging officers of the army or the navy, whenever in his judgment the interest of the service required it to be done, shall not exist, or be exercised, *in time of peace,* except in pursuance of the sentence of a court-martial, or in commutation thereof. There was, as we think, no intention to deny or restrict the power of the President, by and with the advice and consent of the Senate, to displace them by the appointment of others in their places.

It results that the appointment of Gilmore, with the advice and consent of the Senate, to the office held by Blake, operated in law to supersede the latter, who thereby, in virtue of the new appointment, ceased to be an officer in the army from and after, at least, the date at which that appointment took effect, — and this, without reference to Blake's mental capacity to understand what was a resignation. He was, consequently, not entitled to pay as post-chaplain after July 2, 1870, from which date his successor took rank. Having ceased to be an officer in the army, he could not again become a post-chaplain, except upon a new appointment, by and with the advice and consent of the Senate. *Mimmack* v. *United States,* 97 U. S. 426.

As to that portion of the claim covering the period between April 28, 1869, and July 2, 1870, it is only necessary to say that, even were it conceded that the appellant did not cease to be an officer in the army by reason of the acceptance of his resignation, tendered when he was mentally incapable of understanding the nature and effect of such an act, he cannot recover in this action. His claim for salary during the above period accrued more than six years, and the disability of insanity ceased more than three years before the commencement of this action. The government pleads the Statute of Limitations, and it must be sustained. Congress alone can give him the relief which he seeks.

*Judgment affirmed.*