Scofield, <7.,
delivered the opinion of the court:
The claimant, a captain in the Fifth United States Cavalry, presented his claim to the Treasury Department for the increase of longevity pay supposed to be due him under the rule in Tyler's Case (105 U. S. R., 244). The claim was referred to this court by the Secretary of the Treasury, in accordance with the-provision of section 1063 of the Revised Statutes.
*373 It appears from the findings that the claimant served in the Army, as an enlisted man, from August 6, 1860, to December 16, 1862.
December 17,1862, he accepted 'an appointment as second lieutenant in the Fifth Cavalry.
November 20, 1863, he was dismissed from the service “for leaving his command while on picket duty, without authority, whereby he was captured by the enemy.”
May 11, 1864, Edward Harris was nominated by the President “as second lieutenant in the Fifth Cavalry vice Montgomery dismissed.” The nomination was confirmed by the Senate June 7,1864, and Harris was commissioned by the President •June 9,1864.
February 16,1865, by direction of the President, the order of ■dismissal was revoked and the claimant reinstated; thereupon he was paid as a second lieutenant from the date of the dismissal to the date of revocation the sum of $1,651.37.
Upon the last stated fact arises the first question of law in the case, and we will consider it here.
Did the order of revocation have the effect to reinstate the ■claimant as a second lieutenant or to entitle him to back pay?
The power of the President to make the order of dismissal ■cannot be denied, and by the dismissal the claimant became a private citizen. (Act of July 17,1862, sec. 17,12 Stat., 596.)
Whether the President has power to reconsider his own action whereby an officer has been completely severed from the Army and upon such reconsideration revoke the same, and thus without the advice and consent of the Senate restore him to his former place, has been much discussed in the several cases now before us.
.In the .argument great stress was laid upon the propriety of the President having the power in a general way to correct accidental errors. Agreeing to all that, it yet seems a gross perversion of terms to call a proceeding by which a civilian has been forced into the Army, with or without his consent, simply because he had at a former time been an officer in it, a correction of a Presidential errpr. When an officer’s connection with the Army is once entirely and legally severed, does he hold any relation to it that other citizens do not? If the President can restore an officer to the Army by a revocation of a legal dismissal, long before completed, can he not turn him out again *374 by revoking tk e revocation ? Congress has provided many ways to get out of tbe Army, but neither the Constitution nor the laws provide more than one way to enter it. That way is by an appointment by the President, by and with the advice and consent of the Senate.
A comparison of the power of review exercised by the courts and that claimed for . the President was forcibly presented. Courts review their own proceedings, grant new trials, set. aside their own judgments, and revoke their own decrees. Why should not the President in like manner have power to review and revoke his decisions, particularly decisions affecting officers of the Army, of which he is, by the Constitution, commander-in-chief? Without combating the pertinence and force of this argumentative question, it is proper to observe that the power of the courts is derived from and limited and controlled by law. If they grant new trials and revoke former decrees, it is because the law, either statute or common, authorizes them so to do. If they exceed the limits of the law, their action can be reviewed in the highest court, where the wronged party may be righted. The power must always be exercised within a given time and according to established and well known rules and in the face of the bar and the public. The parties litigant and all others who may become interested in a suit well understand at what time a case has passed beyond the power of review.
If the President is to exercise similar power, should it not be conferred by law, and exercised according to established and well known rules ? It should also be observed that the reversal of a judgment or a revocation of a decree rarely, if ever, affects any one but the parties to the suit, who are always heard upon the question, but the President’s revocation of his former approval of the sentence of a court-martial, the finding of a retiring board, the acceptance of a resignation or an order of dismissal may affect, injuriously, a whole line of officers who have had no opportunity to be heard.
The revocation of a decree of divorce, after one of the parties, while the decree is still revocable, has rashly' married again, to which marriage children have been born, may, it is urged, be equally injurious to many innocent persons. If the argument has any force, it goes to show, not that the President should be clothed with such mischievous power, but that the courts should be deprived of it. Besides the President can correct his *375 error, if lie can persuade tlie Senate that it is an error, by a new appointment.
It is true, as it is said, that by the Constitution the President has command of the Army, but by the same instrument Congress is empowed- to make rules for its government. All differences arising under these provisions must be settled by the Supreme Court. We are not sitting here to debate what the law ought to be, nor to hunt for arguments to support abstract theories, but to determine what, by the Constitution and laws, as construed and settled by the Supreme Court, it now is. When that court has decided, though lawyers may still argue and theorists dispute, the inferior courts must follow its rulings.
Fortunately for the peace of Army officers and the stability of the Army Register, but unfortunately for the claimant, the Supreme Court has settled, apparently for good and for all time .to come, the question herein involved. If we have not entirely mistaken the meaning of the decisions in Mimmack’s, Mc-Elrath’s, Blake’s, and Keyes’s Cases, an officer once entirely severed from the Army by the constitutional action of the President, and more particularly if the place has been filled by a new appointment confirmed by the Senate, cannot after-wards be restored to his former position by any action of the President alone. In Mimmack's Case (97 U. S. R., 426), the court held that the President could not, by withdrawing his acceptance of a resignation, although recent, and the vacancy remained unfilled after notice of the acceptance, restore him to the Army without a new appointment made by the President with the advice and consent of the Senate. Notice of the acceptance of the resignation in such case’ is required by the second section of the act of August 5,1861 (12 Stat., 316). Much less can he revoke a dismissal after considerable time has elapsed and the place has been filled by a-new appointment. (McElrath’s Case, 102 U. S. R., 426 ; Blake's Case, 103 U. S. R., 227.)
If the rules were otherwise Congress would be powerless to limit the number of Army officers. The President, after accepting many resignations and making many dismissals, if authorized so to do, and filling the vacancies with new appointments in the course of his term or that of his predecessors, might, by withdrawing acceptances and revoking dismissals, in *376 crease the number of officers far beyond the limits allowed by law. In this particular the President would thus make the law of the Army, as well as command it.
- Doubtless these decisions are wise and timely; but whether so or not, it is the duty of this court to decide the claimant’s case in accordance with them. He had not only been legally dismissed and entirely severed from the Army fifteen months before the revocation took place, but the office had been filled by the appointment of Harris, with the advice and consent of the Senate, about nine months before. In the light of these decisions it is our duty to hold that the claimant was not reinstated to his former place by the revocation of the dismissal.
It follows, from this conclusion, that the payment to him of $1,651.37, for the time he was neither in the Army nor rendering any service whatever to the government, was without authority of law, and this claimant cannot in good conscience retain it.
After revoking the dismissal the President assigned the claimant to duty as second lieutenant, and he was in actual service from February 16, 1865, to April 25, 1865. He was paid ■therefor the sum of $317.61.
Upon this additional fact another question is raised. The defendants seek to recover back this sum also. It is true the claimant was not a second lieutenant de jure during this time, but the President, who ordered him to service, supposed he was, and so did he. He was, however, an officer de facto, and this service was rendered in good faith. Having been paid only a fair compensation for services actually performed, he is under'no legal obligation to return it.
April 25, 1865, the claimant was nominated, confirmed, and commissioned as a first lieutenant. January 3,1870, after nomination to and confirmation by the Senate, he was appointed and commissioned captain. He has since remained in the service, and been regularly paid all that it was then supposed he was entitled to' receive, amounting in all to $42,636.61. By the rules established in the Tyler Case, if the time intervening between November 20,1863, and February 16, 1865, can be credited to him in the computation, he became entitled to recover $255.38 as additional longevity pay; if not so credited, he has already’overdrawn his longevity pay.
■ The defendants not only resist this claim for additional pay, but put in a counter-claim to recover bacli the whole sum of *377 #42,636.61, paid him as first lieutenant and captain, on the ground that being at that time a civilian the appointments were illegal and void.
If this law were as claimed by the defendants they could not, on the principle above stated, recover back the payments already made. The service has been rendered by the claimant, and accepted and paid for at a fair and reasonable rate, by the defendants in good faith.
But after a careful•examination we have not' been able to find any statute by which, in our opinion, on the 25th day of April, 1865, the appointment of a civilian as first lieutenant was made unlawful.
The first legislation upon the subject that needs to be considered here occurred in 1812. At that time the Army regulations of 1801 and 1808, which provided for promotion by seniority, were in force. Bj> the act of June 26, 1812 (2 Stat., 764), two branches of the Army were consolidated, and to avoid confusion in the transfer of officers it was provided in section 5 “ that from and after the passage of this act promotions shall be made through the lines of artillerists, light artillery, dragoons, riflemen, and infantry, respectively, according to established rule.” The words in italics were understood to give legislative sanction to the existing Army regulations. If this were so, it was of short duration; for section 5 of the act of March 3, 1813 (2 Stat., 819), authorized new regulations, and provided that they should remain in force until “ altered or revolted by the President.” In these new regulations, which were promulgated May 1, 1813, it was provided that promotions to the rank of captain shall be made “ regimenially ” This restriction to regimental promotion was complained of by the junior officers, and March 30, 1814 (3 Stat., 114), Congress removed the restriction by providing that u promotions may be made through the whole Army in its Several lines,”- &c. It #oes not appear that this act was intended to give to the regulations then existing the force of law, but was intended only to abrogate one of its restrictions! Nor does it provide that the promotions thus authorized shall be by seniority.-
Section 9 of the act of April 24, 1816 (3 Stat-., 298), provides ¿‘that the regulations in force * * * be recognized as far as the same shall be found applicable to the service, subject, however, to such alterations as the Secretary of War may adopt, with the approbation of the President.”
*378 Section li of the act of March 2, 1821 (3 Stat., 616), which provided that the regulations be “ approved and adopted for the government of the Army of the United States,” was repealed by th¿ act of May 7,1822 (5 Stat., 686). Thus the regulations were left to stand upon Executive sanction only, subject to Executive alterations and exceptions.
Thus far, promotion by seniority appears to have been the outgrowth of “regulation,” rather than of legislation. In the whole course of legislation it does not appear that Congress had at any time directly under consideration the propriety of excluding civilians in all cases from any appointment in the Army above the grade of second lieutenant. In each act the language relied upon in support of such exclusion appears to have been accidentally employed, while legislating with other purposes in view.
Then comes section 16 of the act of August 3,1861 (12 Stat., 289 E. S., sec. 1287), which is as follows :
“ Section 1257. When any officer in the line of promotion is-retired from active service the next officer in rank shall be promoted to his place, according to the established, rules of the service, and the same rule of promotion shall be applied successively to the vacancies consequent upon such retirement.”
The “ established rules of the service” at that time in force provided that—
' “All vacancies in established regiments and corps, to the rank of colonel, shall be filled by promotion according to seniority except in case of disability or other incompetency.” (Army Eegulations, 19.)
Whenever such “ disability or other incompetency ” existed in any given case is left for the determination of the President and Senate. Having made the appointment, it is to be presumed that the President and Senate found the facts that constituted this cas^ an exception to the general rule, and made the appointment in conformity to the statute.
But if the appointments were made in disregard of the statute, their validity might still be sustained by the Supreme Court. The Constitution in substance provides that Congress shall have power to make rules for the government of the Army, but the President, by and with the advice and consent of the Senate, shall select the officers to command it. HoW far Congress has power to circumscribe and control the selection is apparently *379 an open question. We find no decision of the Supreme Court which would authorize us to hold that the appointment of a-civilian would he good in the face of any statute to the contrary. In the Blake Case, before cited, they did not go so far. There they put upon the fifth section of the act of July 13, 1866 (14 Stat., 92), a construction by which the Executive action and the law were made to harmonize. ■ .
But for the reasons before stated we hold that the claimant was properly appointed first lieutenant and afterwards captain in the Army, and is entitled to retain the pay already received as such officer, and to recover any unsettled longevity pay that may be due him under the decision of the Tyler Case. But as-we also hold that the claimant was not in the service, either de jure or de facto, from November 20, 1863, to February 16,. 1865, the time embraced within those dates cannot be credited,, to him. By this calculation of time, claimant has already overdrawn his longevity pay.
For the same reason we hold that the claimant must refund, to the government the $1,651.37, which he wrongfully drew from the Treasury for service not performed. Judgment for that amount will be entered against him.
Nott, J., read an opinion in the preceding case, which, the-two being decided on the same day, was likewise entitled and. filed as his opinion in this. - ^