Nott, J.,
delivered the opinion of the court:
The Act 15th July, 1870 (16 Stat. L., p. 314), provided for a reduction of the Army to a force of 30,000 men. So far as the *244 enlisted men were concerned, the method of reduction was left entirely to the discretion of the President. (§ 2.) So far as commissioned officers were concerned, four methods were prescribed. The first was voluntary resignation, accompanied by the inducements of an honorable discharge and one year’s pay and allowances. (§ 3.) The second was by placing officers upon the retired list, and for that purpose the limited number of the retired list was extended to three hundred. (§§ 3 and 4.) The third was by sending officers reported as “unfit for the proper discharge of their duties” (bat who were not entitled to be placed upon the retired list because their inability was not incurred “in the line of their duty ”) before a military board upon whose unfavorable report they were to be mustered out. (§ 11.) The fourth was by the muster out of all officers who remained supernumerary on the first day of January, 1871. (§ 12.)
These being the general purposes of the statute, the eleventh and twelfth sections more particularly provided as follows:
“Sec. 11. And be it further enacted, That the General of the Army and commanding officers of the several military departments of the Army shall, as soon as practicable after the passage of this act, forward to the Secretary of War a list of officers serving in their respective commands deemed by them unfit for the proper discharge of their duties, from any cause except injuries incurred or disease contracted in the line of their duty, setting forth specifically in each case the cause of such unfitness. The Secretary of War is hereby authorized and directed to constitute a board to consist of one major-general, one brigadier-general, and three colonels, three of the said officers to be selected from' among those appointed to the regular Army on account of distinguished services in the volunteer force during the late war; and on recommendation of such board, the President shall muster out of the service any of the said officers so reported with one year’s pay; but such muster-out shall not be ordered without allowing such officer a hearing before such board to show cause against it.
“ Sec.' 12. And be it further enacted, That the President is hereby authorized to transfer officers from the regiments of cavalry, artillery, and infantry to the list of supernumeraries, and all vacancies now existing, or which may occur prior to the first day of January next, in the cavalry, artillery, or infantry by reason of transfer, or from other causes, shall be filled in due proportion by the supernumerary officers, having reference to rank, seniority, and fitness, as provided in existing law regulating promotions in. the Army. And if any supernumerary officers shall remain after the first day of January next they shall be honorably mustered out of the service with one year’s *245 pay and allowances: Provided, That vacancies now existing in the grade of second lieutenants, or which may occur prior to said date, may be filled by the assignment of supernumerary first lieutenants, or officers of higher grade, who, when so assigned, shall rank as second lieutenants, provided such officer shall prefer to be assigned instead of being mustered out under the provisions of this section; and officers so assigned shall take rank from the date of their original entry into the service. And •provided further, That no chaplain be appointed to posts or regiments until those on waiting orders be assigned.”
The object to be attained by the eleventh section was the dis.charge of officers who were not fit for military service and who were not deserving of the retired list. The twelfth section was comprehensive enough to embrace every officer in the Army, but it was intended for those who were fit to remain in the Army and against whom no ground for discharging them existed. Both sections gave to the discharged officer a parting gift; both were to be carried into effect within the same brief period. There may have been and probably 'were other administrative reasons not perceptible to the judiciary which rendered the machinery provided by the eleventh section desirable, and it is certain that it was resorted to by the President; but nevertheless the twelfth section gave to him ample powers to sift the personnel of the Army, and to accomplish the reduction which was the chief purpose of the statute.
There were, however, two items of difference in the two sections, which affected or might affect the officers upon whom they operated. Under the eleventh section an officer was liable to be mustered out whenever the retirin g board reported upon his case, and would then receive only “ one year’s pay,” which was pay proper, and did not include allowances. (Sherburne’s Case, 16 C. Cls. R.., 491.) Under the twelfth section the officer could not be mustered out until the last moment; that is to say, the 1st January, 1871, and would then receive “one year’s pay and allowances.” Both of these differences operated in favor of the supernumerary officers.
These two sections of the Act 1870 constitute the law of the case; the facts, briefly stated, are as follows:
The claimant, then a first lieutenant of cavalry, was reported by the commanding officer of his department as deemed unfit for the proper discharge of his duty by causes other than injuries incurred or disease contracted in the line of his duty, and *246 his no me was sent before the retiring board then convened in the city of Washington. On the 17th November, 1870, the board requested that he and a number of other officers be given a hearing, as required by the statute. In reply to this application of the board the Adjutant-General of the Army wrote:
“I have the honor to inform you that the stations of the officers named are so remote as to make it impossible for the board to consider their cases, aud therefore the Secretary of War has directed that the officers be not ordered to appear. Their cases, so far as the board is concerned, are viewed as closed.”
Accordingly no notice was given to the claimant and no action was taken' by the board, and nothing further was done until the final and decisive order under the statute was issued for the reduction of this part of the Army and the discharge of all commissioned officers who were not to be permanently retained.
That order bears date and was promulgated on Monday, the 2d January, 1871, it being the first secular day of the new year. Like many orders of the War Department it contained distinct parts or divisions, and was in effect three orders with one enacting clause. The first division directed the transfer of a large number of officers to the list of supernumeraries 5 the second directed the transfer of another set of officers from the list of supernumeraries to various positions and vacancies on the active list; the third directed the muster-out of all officers then remaining unassigned. ,
The first division of this order transferred the claimant from his position in the line to the list of supernumeraries; the second transferred Lieut. Max Wesendorff from the list of supernumeraries to the position made vacant by the claimant’s transfer ; the third directed that the claimant be mustered out of the service.
Under that order the claimant was discharged fromtheserv-ice on the 10th February, 1871, and in the following September he received his year’s pay and allowances, giving therefpr the usual receipt. He now insists that the discharge or muster-out was illegal, and he seeks all of the intermediate pay of the office, amounting to $34,123.
The grounds upon which this demand is pressed are:
(1) That an officer was not liable to be proceeded against under both sections of the statute, and that if the Secretary of War transmitted his name to the retiring board, he could be *247 mustered out only under the provisions of the eleventh section and after the hearing which it assured to all officers sent before the board.
(2) That the power of the President to transfer officers to the list of supernumeraries under the twelfth section expired on the 31st December, 1870.
At the time of the adoption of the Constitution the control of the British army was lodged ex-clusively in the Crown, with hardly a restriction set upon it, save that the continued existence of the standing army required the annual consent of Parliament. From the Mutiny Act, 1689, until Mr. Cardwell’s act, 1879, the control of the Crown remained unchanged and practically unrestricted. The system of purchase in the army formed a cheap and easy method for pensioning or providing for a retiring officer and for securing his services at exceedingly low pay. It moreover had been an established right, founded on unbroken usage for two centuries; an officer, when he won promotion, believed that he was laying up a competence for his old. age, a provision for his wife and children; and the public regarded his commission as his well-earned property, lawfully accumulated and possessed of the sanctity of a vested right. Yet in our own time we have seen a prime minister abolish the system (after Parliament had three times refused to do so) by royal warrant; which was in effect saying that thereafter the Crown would not allow officers to sell out and would not recognize or commission those who purchased.
This power of command and control the framers of the Constitution placed in the hands of the President, with only two restrictions set upon it: that Congress should have power “ to make rules for the government and regulation of the land and naval forces; ” that the appointment of officers should be “by and with the advice and consent of the Senate.’-’
The tenure of a military office has beeu from the foundation of the Government among the frailest known to the law, for it has been subject to the will of the President, and that will has been repeatedly exercised. Nevertheless a usage greatly respected and upheld by the legislative and executive branches of the Government, and which certainly should be noticed and respected by the judiciary, has made the tenure of a military office practically for life or good behavior. The power of removal as such — that is to say, without cause — has never been *248 asserted in terms, it is believed, against an officer of the Army or Navy, and until the decision of the Supreme Court in, Blalce’s Case (103 U. S. R., 227), in 1880, was almost unsuspected.
The power to dismiss ah officer, as has been said, has been repeatedly exercised and has been recognized and sanctioned by Congress. But inasmuch as it carried with it a taint of dishonor, and was resorted to only in cases of shameful delinquency or gross incapacity,' and was deemed by those most interested as one of the severest penalties known to military law, it was proper for Congress to regulate and restrict its application under the constitutional authority vested in them. (Acts 17th July, 1802 ; 3d March, 1865; 17th July, 1866; 12 Stat.. L., 596; 13 id., 489; 14 id., 92; Blake's Case, 103 U. S. R., 227.)
Still the limitation was itself limited. The purpose of the . Act 17th July, 1866, was not to attach a life tenure or element of vested right to the office, but to save officers “in time of peace” from the ignominy of a hasty and dishonorable dismissal. The practical results of the statute, in connection with the other provisions of law bearing upon the subject, are these: that in time of war the President may dismiss an officer from the service at any moment and for any cause; that in time of peace he may dismiss him for cause with the co-operation of a court-martial, or remove him without cause with the consent of the Senate.
The acts of 1866 and 1870 are therefore neither in conflict nor in pari materia. They spring from different provisions of the Constitution. The one is an exercise of the legislative power “ to make rules for the government and regulation of the land and naval forces; ” the other of the power “ to raise and support armies.” The former relates to the punishment or protection of the individual officer ; the latter to the Army at large. It was the purpose of the one to secure to each officer a trial by court-martial in all cases “ in time of peace; ” it was the purpose of the other to reduce the Army of the United States from forty-five to twenty-flve regiments.
The fundamental error of the claimant’s case, in the opinion of the court, lies in the supposition that the President, under the act, became in this matter functus officio on the 31st December, 1870. If the statute had been enacted to confer a privilege upon the President, or a benefit upon the officer; if it were *249 with officers as it is with privates, that an honorable discharge with a year’s pay and allowances would be accepted at any time by every enlisted man in the Army, and esteemed extraordinary good fortune, it might be held that the power to grant discharges must be exercised strictissimi juris, prior to the first day of January next.”
' But the purpose of the statute was neither to confer privileges, nor create benefits, nor authorize forfeitures. The single object of the enactment was to place the Army upon a permanent peace footing of twenty-five regiments. It cast upon the President the responsibility of carrying the enactment into effect and constituted him the sole agent of the Government to execute the legislative fiat. It gave the agent means for acting, and prescribed a period of action, and directed him to perform the duty within that time. Such a power is of course to be executed, if that be possible, within the prescribed time; but to hold that if it be not, it can not be executed at all, would be to hold that the laches or inability or accident or mistake of an executive officer should defeat the legislative will.
The statute did not execute itself. It provided for reduction by resignation, by retirement, by the selection of a retiring board, and by the selection of the President. All of these means united to make the plan of reduction. The officers upon the list of supernumeraries were not there because of their demerits. They were entitled to’ the consideration of the President, and the Government was entitled to the benefit of selection from them. The list had been founded upon what might be termed juniority. When two companies were consolidated, each having, say, its own second lieutenant, the junior became a supernumerary. Hence the list of supernumeraries may have contained the best and most deserving officers in the service, and it was a cardinal element in the scheme that such should be retained.
A paper has been introduced by the defendants from the files of the War Department, purporting to be an order of the President signed by the Secretary of War, December 31, 1870; entitled General Orders 000, and dated December 000,1870; and the claimant has offered evidence tending to show that the signature of the Secretary was not affixed until the 2d January, 1871. The court, however, must reject both the paper and the evidence to contradict its date. In the case of a proclamation *250 ■of the President, it was held by the Supreme Court that the proclamation must be proved by its record, and that evidence could not be introduced to show that it was dated at one time and promulgated at another. (La Peyre’s Case, 17 Wall., 191.) In the present instance the court must go by the record of the War Department. A paper found in its files which was never issued, which was never promulgated, which was never executed, and which, if it ever existed as an intended order and not as a mere memorandum, .was immediately supplanted by a formal order (that of January 2,1871) duly entitled, promulgated, and carried into execution, can not be regarded by the court as the order of the President whereby he executed and carried into effect the statute for the reduction of the Army.
The defense must stand or fall on the real order of the President and its record, the order by which he finally and only sought to transfer the claimant to the list of supernumeraries, and muster him out as such, the order of January 2,1871, entitled “General Orders No. 1.”
The case then stands in this condition: That the statute (§ 12), without specifying a time, authorized the President to transfer officers to the list of supernumeraries, and in terms required that all vacancies which might occur in the line “ prior to the first day of January,” 1871, should be filled “ by the supernumerary officers; ” that on the 31st December, 1870, no transfers had been made to the list'of supernumeraries, and no vacancies existed in the line, and no officers had been mustered out on the recommendation of the retiring board. The 1st of January, 1871, fell on Sunday, a dies non in the clerical work of the War Department, so that the question resolves itself into this, whether the President was required to issue two orders, the one on the 31st December, 1870, transferring officers; the other on the 1st January, 1871, mustering out all who had not been assigned %
The court is of the opinion that in view of the constitutional functions of the President, in view of the restricted purpose of the Act 1860, in view of the general purpose of the Act 1870, Congress did not intend to make the reduction of the Army conditional upon its being carried into effect within a designated time, and that it was equally beyond the legislative intent that one provision of the statute should be carried into *251 effect and another should fail. In other words, the court is of the opinion that the power of the President to carry into effect the provisions of the law continued until his entire duty was performed.
The judgment of the court is that the petition of the claimant be dismissed.