# The President's Power to Remove the Board of Directors of the Pennsylvania Avenue Development Corporation

In the absence of a clear legislative intent to the contrary, the President may remove his appointees at will. The Pennsylvania Avenue Development Corporation Act of 1972, 40 U.S.C. §§ 871 *et seq.*, provides for appointment of a board of directors by the President, but is silent on removal.

Although the Act provides for a six-year term of office, a provision for a term, by itself, is not a restriction on the President's removal authority, but rather, is a limitation on the period for which an appointee may serve without reappointment.

Nothing in the statutory scheme, legislative history, or in the nature of the Board's functions, indicates an intent to restrict the President's removal power. Therefore, the board of directors may be removed by the President at will.

May 18, 1983

MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

This memorandum responds to your request for our opinion whether the President has the power to remove the directors of the Pennsylvania Avenue Development Corporation (PADC). We assume that your inquiry is directed to those directors who are appointed by the President pursuant to 40 U.S.C. § 872(c)(8), as opposed to those who serve *ex officio*. We conclude that the President does have the power to remove the directors of the PADC appointed by him under § 872(c)(8).

## I. The Board

· The Board was established pursuant to the provisions of the Pennsylvania Avenue Development Corporation Act of 1972, Pub. L. No. 92–578, 86 Stat. 1266 (codified at 40 U.S.C. §§ 871 *et seq.* (1976)) (Act). Section 872 creates the Corporation as a wholly owned government corporation, and vests its powers and management in a Board of Directors consisting of the Secretaries of the Interior, Treasury, Housing and Urban Development, and Transportation, the Administrator of General Services, the Mayor of the District of Columbia, the Chairman of the Council of the District of Columbia, and "eight [additional members], at least four of whom shall be residents and who are registered voters of the District of Columbia, appointed by the President from private life, who shall have knowledge and experience in one or more fields of

116

history, architecture, city planning, retailing, real estate, construction, or government." 40 U.S.C. § 872(c)(8).

Section 872(e) provides in part that each member appointed pursuant to § 872(c)(8) "shall serve for a term of six years from the expiration of his predecessor's term." Subsection (e) also provides for staggered terms, and for the appointment of directors to serve out the remainder of terms. Directors may continue to serve until their successors are qualified. Subsection (f) provides that the President is to designate a Chairman and Vice Chairman from among the private members. Subsection (g) provides for eight *ex officio* non-voting members. The Act contains no provision concerning the removal of directors.[1]

## II. Statutory Interpretation

The determination whether the President has the power to remove a Presidential appointee presents initially a question of statutory interpretation. If the statute is interpreted to reflect an intention to restrict the President's removal power, it is then necessary to reach the constitutional question whether the Congress had the power to do so. Here, we find it unnecessary to reach the constitutional question because we conclude that there is no persuasive evidence of a congressional intent to restrict the President's power to remove the directors of the PADC.

### A. *Governing Law*

In the absence of a provision to the contrary, the power to appoint carries with it the power to remove.[2] Accordingly, if a statute provides for appointment by the President, but is silent on the subject of removal, the President may remove an appointee unless the statutory scheme and legislative history demonstrate that Congress intended implicitly to limit the President's removal power. A statute is silent on the subject of removal if it contains neither an express provision restricting removal nor other provisions relating to the appointee's tenure in office or terms of removal which must be interpreted as intended to restrict the removal power. Provisions for a term, such as the provision for a six-year term in the PADC Act, by themselves, have not been interpreted as intended to restrict the removal power, but rather as limitations on the period for which an appointee can serve without reappointment.[3] A provision for a term, coupled with a provision setting forth the bases for

---

[1] The bylaws of the Corporation, which appear at 36 C.F.R. §§ 901.1–901.7 (1982), also contain no provision concerning the removal of directors.

[2] James Madison announced this rule during the first session of the First Congress. 1 Annals of Cong. 479 (J. Gales ed. 1789). The courts have consistently upheld the applicability of the rule. *Matter of Hennen*, 38 U.S. (13 Pet.) 230, 259–60 (1839); *Blake* v. *United States*, 103 U.S. 227, 231 (1880); *Myers* v. *United States*, 272 U.S. 52, 119 (1926); *Cafeteria Workers* v. *McElroy*, 367 U.S. 886, 896–97 (1961); *Sampson* v. *Murray*, 415 U.S. 61, 70 n.17 (1974); *National Treasury Employees Union* v. *Reagan*, 663 F.2d 239, 246–48 (D.C. Cir. 1981); *Kalaris* v. *Donovan*, 697 F.2d 376 (D.C. Cir.), *cert. denied*, 462 U.S. 1119 (1983).

[3] *See e.g., Parsons* v. *United States*, 167 U.S. 324, 338 (1897); *Martin* v *Tobin*, 451 F.2d 1335, 1336 (9th Cir. 1971).

117

removal for cause, may be interpreted as a restriction on the President's removal power.[4]

## 1. Quasi-judicial or Quasi-legislative Functions

If it is concluded that a statute providing for Presidential appointment is silent on the subject of removal, it is necessary next to determine whether Congress intended implicitly to restrict the President's removal power. The starting point in making this determination is an examination of the functions of the appointee's office. For example, the performance primarily of quasi-judicial functions will support the inference that Congress intended to restrict the President's removal power. *See Wiener* v. *United States,* 357 U.S. 349 (1958); *cf. Humphrey's Executor* v. *United States,* 295 U.S. 602 (1935).[5] The *Wiener* case involved a challenge to the removal of a member of the War Claims Commission. The statute which created the Commission provided for appointment by the President with the advice and consent of the Senate, but was silent on the subject of removal. The Court said that "the most reliable factor for drawing an inference regarding the President's power of removal in our case is the nature of the function that the Congress vested in the War Claims Commission." 357 U.S. at 353. The Court referred to "the sharp line of cleavage" it had drawn in *Humphrey's Executor* "between officials who were part of the Executive establishment . . . and those who are members of a body 'to exercise its judgment without the leave or hindrance of any other official or any department of the government' . . . ." *Id.* at 353. In *Wiener,* the Court relied on the War Claims Commission's performance of adjudicative functions to infer that Congress intended to restrict the President's power to remove its members. 357 U.S. at 356. Because the Commission was established to adjudi-

---

[4] In *Humphrey's Executor* v. *United States,* 295 U.S. 602 (1935), the provision for a term was coupled with a provision for removal for cause; the Court also emphasized legislative history indicating that Congress intended the Federal Trade Commission to be independent of executive control

[5] The Supreme Court cases addressing the President's power to remove persons appointed by him consists of the trilogy of *Myers* v. *United States,* 272 U.S. 52 (1926); *Humphrey's Executor,* 295 U.S. 602 (1935); and *Wiener* v. *United States,* 357 U.S. 349 (1958). *Myers* held that Congress cannot limit the President's power to remove the persons appointed by him by and with the advice and consent of the Senate. *Humphrey's Executor* held that Congress can limit the President's power to remove quasi-judicial and quasi-legislative officers, restricted the scope of Myers to purely executive officers, and left open the question whether and to what extent Congress can limit the President's power to remove those of his appointees who perform neither quasi-judicial, quasi-legislative, nor purely executive functions: "To the extent that, between the decision in the *Myers* case, which sustains the unrestrictable power of the President to remove purely executive officers, and our present decision that such power does not extend to an office such as that here involved, there shall remain a field of doubt, we leave such cases as may fall within it for future consideration and determination as they may arise." 295 U.S. at 632. Finally, *Wiener* sustained the restriction on the President's removal power which it held could be inferred from the War Claims Commissioner's performance of adjudicative functions

The *Myers* case is limited to officers appointed by the President by and with the advice and consent of the Senate. *United States* v. *Perkins,* 116 U.S. 483 (1886) held that where Congress vests the appointment power in a Department head under Article II, § 2 of the Constitution, it may limit the removal power. *Myers* did not decide whether *Perkins* applies where the power of appointment is vested in the President alone, because the issue was not before it. It strongly suggested, however, that the question was to be answered in the negative. 272 U.S. at 161–62. In *Martin* v. *Reagan,* 525 F. Supp. 110 (D. Mass. 1981), the Court held that an officer appointed by the President alone may be removed by the President at will.

cate according to law, and "one must take for granted" that the statute "precluded the President from influencing the Commission in passing on a particular claim, a *fortiori* must it be inferred that Congress did not wish to have hang over the Commission the Damocles' sword of removal by the President." *Id.* In *Humphrey's Executor,* the Court stated that "the very nature of the Federal Trade Commission duties" require it to "act with entire impartiality . . . . Its duties are neither political nor executive, but predominantly quasi-judicial and quasi-legislative." 295 U.S. at 624. *Humphrey's Executor* rested its conclusion that Congress intended to restrict the President's power to remove the Commissioners only in part on the Commission's performance of those functions.

The opinions in *Wiener* and *Humphrey's Executor* do not attempt to define the terms "adjudicatory" or "quasi-judicial and quasi-legislative" with any precision. However, some functions are clearly within the scope of those terms. In *Wiener,* the Court characterized the War Claims Commission's function as "adjudicat[ion] according to law," "that is, on the merits of each claim, supported by evidence and governing legal considerations." 357 U.S. at 355. In *Humphrey's Executor,* the Court pointed to the FTC's function to "exercise the trained judgment of a body of experts 'appointed by law and informed by experience,'" its "duties as a legislative or as a judicial aid," and its responsibilities for "investigations and reports thereon" to Congress. 295 U.S. at 624, 628. The Court also discusses the FTC's adjudicative functions. *Id.* at 628. Thus, the assignment to an official of the performance of quasi-judicial and quasi-legislative functions, at least including "adjudicat[ion] according to law," supports an inference that Congress intended to restrict the President's removal power. Performance of quasi-legislative functions, including substantive rulemaking, *cf. id.* at 624, may not by itself support such an inference, but is some evidence of intent to restrict.

### 2. Presumption that Officer is Removable

If the statute is silent on removal and the officer performs neither quasi-judicial nor quasi-legislative functions as those terms are used in *Wiener* and *Humphrey's Executor,* the presumption that the President may remove him at will controls. Only strong and unambiguous evidence of congressional intent is an adequate basis for concluding that Congress intended implicitly to restrict the President's removal power. As the Court said in *Shurtleff* v. *United States,* 189 U.S. 311 (1903):

> It cannot now be doubted that in the absence of constitutional or statutory provision the President can by virtue of his general power of appointment remove an officer, even though appointed by and with the advice and consent of the Senate. . . . To take away this power of removal in relation to an inferior office created by statute, although that statute provided for an appointment thereto by the President and confirmation by the Senate,

> would require very clear and explicit language. It should not be held to be taken away by mere inference or implication.

*Id.* at 314–15.[6]

Legislative history suggesting that Congress looked favorably on the concept that a particular official would be "independent" of executive control ordinarily will not be enough. The concept of "independence," in the abstract, has connotations that are appealing, and the term is often used in floor debates and legislative history without any specificity as to what precisely is intended. However, "independence" is less attractive if it comes at the cost of accountability. Congress presumably recognizes that an official who is not removable may act beyond the control of elected officials. Perhaps for this reason, the discussion of "independence" during legislative debates often goes no further than the abstract concept and seldom ripens into a clear specification of a legislative intent to make an appointed official non-removable.

Because Congress knows how to provide expressly for restrictions on removal if it chooses,[7] the serious constitutional questions raised by congressional attempts to restrict Presidential removal of such appointees should be avoided unless it is clear that Congress intended squarely to face the constitutional issue and affirmatively desires that an official be independent of and not accountable to the President. The burden of demonstrating intent to restrict the President's removal power is heaviest when the officer performs "purely executive" functions, and an attempt to restrict the power to remove such an officer would be unconstitutional under *Myers.* The burden is also heavy when an officer performs a mixture of executive and other functions, and his functions cannot be described as "predominantly quasi-judicial and quasi-legislative," or where his functions fall in the "field of doubt" between purely executive and quasi-judicial and quasi-legislative functions. A restriction on the President's power to remove such an officer would raise serious and unsettled questions of constitutional law under *Myers, Humphrey's Executor* and *Wiener. See supra* note 5.

## B. Application of the Governing Law

The application of these principles to the PADC Board is straightforward. The Act provides for appointment by the President, but is silent on the subject of removal: there is no express restriction on removal nor is there any legislative history on the subject of removal, and the only provision relating to tenure in office is the provision for a six-year term.[8] As noted, a provision for a term,

---

[6] In *Shurtleff* the Court concluded that a provision for removal for cause did not constitute such language. In *Humphrey's Executor,* the Court distinguished *Shurtleff* on the ground that the statute there contained no provision for a term. 295 U.S. at 621–23.

[7] *See, e.g.,* 42 U.S.C. § 2996c(e) (Board of the Legal Services Corporation).

[8] The House Report, the only Committee Report submitted with the 1972 legislation, makes no mention of removal of members of the Board. *See* H.R. Rep. No. 1445, 92d Cong., 2d Sess. (1972).

120

by itself, is not a restriction on removal. Thus, nothing in the Act or its legislative history suggests an intent to restrict the removal power.

Having concluded that the statute is silent on removal, we turn next to an examination of the functions of the PADC Board to determine whether it performs quasi-judicial or quasi-legislative functions. It does neither. In establishing the PADC, Congress found "that it is in the national interest that the area adjacent to Pennsylvania Avenue between the Capitol and the White House," which has been designated a national historic site, "be developed, maintained, and used in a manner suitable to its ceremonial, physical, and historic relationship to the legislative and executive branches of the Federal Government and to the governmental buildings, monuments, memorials, and parks in or adjacent to the area." 40 U.S.C. § 871(a). Congress further found "that to insure suitable development, maintenance, and use of the area and the elimination of blight, it is essential that there be developed and carried out as an entirety plans for this area which will specify the uses, both public and private, to which property is to be put, the programming and financing of necessary acquisitions, construction, reconstruction, and other activities." *Id.* § 871(c). The two chief functions of the PADC under the statute are to develop such a plan and to carry it out. Section 874 governs the content of the redevelopment plan and the procedures for its preparation, approval and revision.[9] Section 875 sets forth the powers conferred on the corporation to carry out the development plan, including the powers to acquire land by, *inter alia,* condemnation proceedings, *id.* § 875(6); to establish by covenants, regulation and otherwise "such restrictions . . . as are necessary to assure development, maintenance, and protection of the development area in accordance with the development plan," *id.* § 875(8); to "borrow money from the Treasury of the United States" as authorized in appropriations acts, *id.* § 875(10); to "contract for and accept gifts or grants or property or other financial aid . . . from any source," governmental or other, *id.* § 875(13); and "utilize or employ the services of personnel of any agency . . . of the Federal Government." *Id.* § 875(21).

As the foregoing review demonstrates, the functions of the Board are neither quasi-judicial nor quasi-legislative within the meaning of *Humphrey's Executor* and *Wiener.* Because there is nothing in the statutory scheme or legislative history to overcome the presumption that the President has authority over such officials whom he appoints, and that the directors are therefore removable at will, we conclude that the President may remove the directors of the PADC.

### III. Conclusion

The Act provides for appointment of the directors of the PADC Board by the President, but is silent on the subject of removal: no provision in the Act

---

[9] The plan must include, *inter alia,* the types of uses permitted, criteria for design of buildings and open spaces, an estimate of the re-use values of the properties to be acquired, a determination of the marketability of the development, and the procedures for insuring continuing conformance to the development plan. *Id.* at § 874(a).

expressly restricts the President's removal power, nor is there any provision bearing on the directors' tenure in office or terms of removal which must be interpreted as intended to restrict the President's removal power. Moreover, because the PADC Board's functions are neither quasi-judicial nor quasi-legislative as those terms are used in the Supreme Court cases addressing the President's removal power, no inference can be drawn from the functions assigned to the Board that Congress intended implicitly to restrict the removal power. In these circumstances, a presumption arises that the President may remove his appointees at will. As our discussion of the PADC Act and its legislative history have demonstrated, there is nothing in either that history or the statutory scheme to overcome this presumption. We therefore conclude that the directors of the PADC may be removed by the President at will.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*